UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TERRENCE B. LAUREY,

                Petitioner,             **REPORT AND RECOMMENDATION**

    -vs-                             No. 07-CV-6154(CJS)(VEB)

H.D. GRAHAM,

                Respondent.
_____

## I.      Introduction

Petitioner Terrence B. Laurey ("Laurey" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his August 16, 2002 conviction following a jury trial in Chemung County Court on one count of second degree robbery (N.Y. Penal Law ("P.L.") § 160.10(2)(b)).  This matter has been referred to the undersigned for the issuance of a report and recommendation regarding the disposition of Laurey's petition. For the reasons that follow, I recommend that the petition be dismissed and that no certificate of appealability issue.

## II.     Factual Background and Procedural History

### A.     Summary of Relevant Trial Testimony

On July 20, 2001, Pamelia Dolaway ("Dolaway"), the night-shift manager at a Wilson Farms/Sugar Creek convenience store ("the Sugar Creek") in Southport, New York, was putting away lottery tickets when she heard someone yelling at the front of the store. When she looked up, Dolaway found herself face-to-face with Laurey standing on the other side of the counter. He was pointing a gun in her direction and yelling, "Give me the money," as he pounded on the side

of the cash register with his fist. Dolaway described the robber as a black male about six-feet-tall, wearing dark clothing, with a blue and white bandanna across his face obscuring most of his face (Dolaway could see only from the bridge of his nose up to his hairline). T.48-51, 65-66, 78-79.[1] Dolaway was unable to identify Laurey at trial as the perpetrator of the robbery. T.72-72.

Alyce Nybeck ("Nybeck") claimed to have heard a conversation between Laurey and a friend of Laurey's named "Brian." According to Nybeck, Laurey said that "[h]e wasn't shitting him [i.e., Brian], that he robbed the store." T.111-13, 116. Laurey did not mention which store he had robbed. T.112. Laurey was laughing about it, as if it were a joke. *Id.* Nybeck believed that the conversation occurred over the weekend of July 22, 2001, at a crack house owned by Maybel Golden on Columbia Street. *Id.* Nybeck did not know "Brian's" last name. T.122-23, 124-27. While she was incarcerated in the Chemung County Jail with one of petitioner's sisters, Elaine Laurey ("Elaine"), Nybeck first had approached the police about the overheard conversation. T.118. According to Nybeck, before she had approached the police, she had asked Elaine if she knew petitioner and whether Elaine knew anything about the robbery. T.119-21. Nybeck said that it was Elaine who arranged for Nybeck to speak with the police. T.121, 127-28.[2]

Penny Laurey ("Penny") testified that she was petitioner's girlfriend at the time of crime and drove the get-away car for the robbery. T.133, 145-47. Penny and petitioner got married on August 1, 2001, a little less than two weeks after the robbery. T.143, 170. Prior to trial, Penny

---

[1]      Citations to "T.___" refer to the trial transcript, a copy of which is attached as Respondent's Exhibit ("Resp't Ex.") D to the Declaration in Opposition to the Petition.

[2]      Elaine agreed that she and Nybeck had spoken frequently while they were in jail, but she denied that they discussed Laurey's case. According to Elaine, Nybeck had only asked whether she (Elaine) knew petitioner. Nybeck then told Elaine about her visit to Golden's crack house, and inquired whether petitioner knew "Brian." *See* T.274-75. When Elaine said that she did know "Brian," Nybeck responded, "then your brother is the one that robbed the Sugar Creek, because I heard him talking about that" at the crack house. *See* T.276-78.

had given a statement and testified before the grand jury regarding Laurey's planning and execution of the robbery. *See* T.133, 148-68. However, shortly after she took the stand at trial, and just as the prosecutor began to question her about her activities with Laurey on the day of the robbery, Penny invoked her Fifth Amendment privilege against self-incrimination. T.130-32.

During a brief recess, the prosecutor explained that he had no idea that the witness was going to plead the Fifth and stated that during the interim between signing her statement and trial, Penny had refused to speak with him. T.133. The prosecutor stated that he observed her looking directly at petitioner and although he (the prosecutor) was "unable to see [petitioner's] expression . . . she seemed to cower at that look, and then she asked to go back and talk with her attorney . . . ." T.133. When she returned, she invoked her Fifth Amendment rights and refused to answer any more questions. *Id.*

After conferring with Penny and her attorney, the prosecutor agreed to grant her transactional immunity for the subject matter of her testimony. T.138-41. Penny then recanted her grand jury testimony. *See* T.142-40, 154-68, 173-77, 186-92. The prosecutor was permitted to impeach Penny with her grand jury testimony, but the trial court instructed the jury that it could not consider Penny's prior statements as part of the prosecution's case-in-chief. T.151-54; *see also* T.451-52. The prosecutor also elicited from Penny that petitioner had called her numerous times prior to her giving testimony at trial. Although she denied it on the stand, Penny had complained in the past to the prosecutor that Phyllis Dean Long ("Phyllis"), another one of petitioner's sisters, as well as other members of petitioner's family, had attempted to influence her testimony. *See* T.168-69, 185-86, 192-95, 200.

Elaine, petitioner's sister, met with Sergeant William A. Schrom ("Sgt. Schrom") of the

Chemung County Sheriff's Office about the Sugar Creek robbery on August 21, 2001. When

Sgt. Schrom showed Elaine the still photographs taken from the convenience store's surveillance

videotape, she said, "I'll be damned, that guy looks just like my brother." T.279. Elaine believed

that the person on the videotape was her brother based on his posture, the "dip" in his walk, his

body structure, his hands, and the way in which he held his gun. *See* T.238-45, 278-80, 283-85.

At first, Elaine told Sgt. Schrom that she could only say that petitioner "might" be the individual

depicted, but she eventually became certain that it was Laurey after looking at the pictures

several times. *See* T.297-98, 301, 305-07, 336.

On the same day she was shown the photographs, Elaine made a three-way call[3] to her

brother from the Chemung County Jail, where she was incarcerated. She asked him "what was

going on." Laurey told her that his wife, Penny, had been picked up by the police, and that he

was forced to move because "he had done something wrong, and he had to get out of there." *See*

T.245-27. Elaine again made a three-way call to petitioner on September 4, 2001, in which she

directly asked him if he had robbed the Sugar Creek. Laurey "said yeah . . . . He said that he had

a hit." T.247-49. When Elaine specifically asked him, "You mean you robbed the store?",

Laurey replied, "Word," which Elaine understood was street-slang for "yes." T.249.

Sgt. Schrom testified that when Elaine eventually gave him a statement on September 9,

2001, she asked for "consideration" in return. T.301-03. Sgt. Schrom did not promise Elaine a

deal in exchange for her statement implicating petitioner. *See* T.252. Sgt. Schrom did convey

her request to the prosecutor, who indicated only that her cooperation with the investigators

---

[3]    Elaine explained that a three-way call is "when someone else makes the call for you, they put you on hold, they click over, and they dial a number, and then when the person pick [sic] up, then you answer the phone" and "[t]hey switch back over." Ultimately, three parties are participating in the phone call. T.245.

would be "considered." *See* T.304-05.[4]

The defense called three witnesses: Barbara Kelly ("Kelly"), who had been incarcerated with Elaine and Nybeck; Jean Gilliam ("Gilliam"), an acquaintance of Elaine's; and Mary Laurey, petitioner's mother.[5]  Kelly testified that Elaine asked her to place three-way phone calls from the jail to petitioner on about ten occasions. *See* T.362-65. Kelly stated that she did not hear Laurey admit to any crimes during those calls. *See* T.369-70. On cross-examination, Kelly conceded that Elaine could have made other three-way calls outside of her presence. T.370. Kelly indicated that she had spoken to Elaine about four times and to Nybeck once; these conversations concerned the fact that Elaine and Nybeck had spoken with the police about Laurey's involvement in a robbery. *See* T.365-67, 369.

Gilliam, who had known Elaine since she was sixteen-years-old, testified that Elaine had been addicted to crack cocaine for about nine years. Contrary to Elaine's testimony, Gilliam stated that Elaine had used crack recently. T.372-77. Petitioner's mother similarly testified that Elaine had been a crack addict for years and had used crack recently. According to her, Elaine had stolen money from her in the past. T.381-89. Gilliam indicated that she had discussed Elaine's testimony against her brother on about three occasions. T.377-79.

The jury returned a verdict convicting Laurey of second degree robbery as charged in the indictment. *See* T.475.

---

[4]     When Elaine later pled guilty to the charges of third degree robbery on which she was incarcerated at the time of her statement to Sgt. Schrom, the district attorney's office interceded and allowed her to plead down to a reduced charge as consideration for her assistance with the investigation into the Sugar Creek robbery. *See* T.252-53, 254-63, 267, 283.

[5]     Golden, the owner of the crack house at which Nybeck overheard petitioner admit to the crime, refused to appear in court. She ignored the subpoena with which she was served. After conferring with Laurey's family, defense counsel, however, declined the trial court's offer to have Golden served with a material witness order. *See* T.391, 395, 398; *see also* Resp't Ex. O at 4-5.

**B.      Post-Trial Proceedings**

      **1.      The C.P.L. § 330.30 Motions and the Hearing on "Newly Discovered Evidence"**

Prior to Laurey's sentencing hearing, defense counsel made two motions to set aside the verdict pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30. In support of the first one, trial counsel asserted that it was erroneous for the prosecution to have used Penny's grand jury testimony to impeach her at trial, and that the verdict was against the weight of the evidence. *See* 3/15/02 Transcript ("Tr.") at 2-3 (Resp't Ex. G). The trial court denied the motion in an oral ruling. *See id.*

Trial counsel submitted a second C.P.L. § 330.30 motion on April 10, 2002, contending that he had newly discovered evidence sufficient to justify setting aside the verdict. *See* C.P.L. § 330.30 Motion filed 4/10/02, submitted as part of the record on appeal (Resp't Ex. A at A30-A41). Counsel submitted an affidavit attaching jail records showing that a person named Bryan Parker, an acquaintance of petitioner's, had been incarcerated over the weekend of July 22, 2001. Thus, petitioner argued, Nybeck's claim that she had overheard Laurey make a confession to his friend "Brian" that weekend was false. Laurey also submitted an affidavit from Michelle Kingsley ("Kingsley"), an inmate with Elaine and Nybeck at the Chemung County Jail. According to Kingsley, Elaine and Nybeck had conspired to testify falsely that petitioner had admitted to the robbery.

Following oral argument on the C.P.L. § 330.30 motion held on April 19, 2002, the trial court found that Bryan Parker's location on the weekend in question did not constitute new

evidence.[6] With a minimum amount of diligence, the defense could have located Bryan Parker before the completion of trial since he and petitioner supposedly had been friends since at least July 2001. The judge also suggested that by talking with Golden, the owner of the crack house at which the admission was made, trial counsel could have ascertained the identity of the person named "Brian" to whom Nybeck had referred. As the trial court pointed out, the defense was given sufficient time to secure Golden's testimony and, as noted above, Golden was under subpoena at the time of trial.[7] *See* 4/19/02 Tr. at 10-12 (Resp't Ex. H). Finding the Bryan Parker issue to be one of impeachment rather than "new evidence," which was not a proper basis for a C.P.L. § 330.30 motion, the trial court denied relief. *See id.* at 16-18; *see also* N.Y. CRIM. PROC. LAW § 330.30. However, the trial court did order a hearing pursuant to *People v. Stokes*, 83 A.D.2d 968, 969 (App. Div. 2d Dept. 1981), with regard to the assertions made by Kingsley in her affidavit.[8] *See* 4/19/02 Tr. at 19-21 (Resp't Ex. H).

At the hearing, the defense presented Kingsley, and the prosecutor called Sgt. Schrom, who had investigated Kingsley's statements made in her affidavit. *See* Resp't Mem. at 11-13, *see generally* Volumes 1 & 2 of the *Stokes* Hearing Transcript (Resp't Ex. I & J). Kingsley claimed

---

[6]     Under C.P.L. § 330.30, "new evidence" is such that "has been discovered since the trial which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial[,] the verdict would have been more favorable to the defendant." N.Y. CRIM. PROC. LAW § 330.30(3).

[7]     Although trial counsel had made representations at trial that Golden had been subpoenaed, he later denied at the C.P.L. § 330.30 hearing that he had subpoenaed her. *See* Resp't Ex. H at 10-11.

[8]     In *People v. Stokes*, the defendant submitted alleged newly discovered evidence in the form of a witness affidavit but the trial court denied his motion to set aside the verdict without hearing. The Second Department found that this was error, holding that the proposed testimony did not constitute merely contradictory evidence, nor was it for the sole purpose of impeaching the prosecution witness' testimony. Therefore, the question of whether the affidavit of the new defense witness was truthful should have been determined at a hearing, where the witness' credibility could have been assessed on a more substantial basis than merely her written statement; a more complete record, with testimony, would allow both the trial court and the appellate court to more effectively weigh the impact such testimony might have had on the verdict. *Stokes*, 83 A.D.2d at 969.

that she had overheard a series of partial conversations between Elaine and Nybeck. According to Sgt. Schrom, who investigated Kingsley's allegations of a conspiracy between Elaine and Nybeck, Kingsley admitted to him that neither Nybeck nor Elaine had ever told her that they had lied to incriminate Laurey, and that she had only surmised that Elaine was coaching Nybeck in a lie from the parts of the conversations she was able to hear. *See* Resp't Ex. I at 68-70; *but see id.* at 39 (testimony of Kingsley denying making such admissions to Sgt. Schrom). Before he spoke with Kingsley, Sgt. Schrom interviewed Nybeck and Elaine, who affirmed the truthfulness of their statements to the police about petitioner's involvement in the crime. *See* 5/14/02 *Stokes* Tr. at 13-15, 17-27 (Resp't Ex. J).

Kingsley ultimately admitted, upon cross-examination and questioning by the trial judge, that she had  given her affidavit to petitioner's counsel at the behest of petitioner's sister, Phyllis.[9] Sgt. Schrom also testified that Nybeck had contacted the police because she was being pressured by petitioner's family to recant her testimony. *See* 5/9/02 *Stokes* Tr. at 75-82 (Resp't Ex. I ); 5/14/02 *Stokes* Tr. at 22-24 (Resp't Ex. J). Coincidentally, this was about a week or two before Kingsley had given her affidavit to defense counsel.

To verify Nybeck's claims of coercion by petitioner's family members, Sgt. Schrom arranged to tape a phone call made by Nybeck to Phyllis on April 11, 2002. During the conversation, it was apparent that Phyllis and Kingsley were together, since Nybeck first spoke to Kingsley who then handed the phone to Phyllis. 5/14/02 *Stokes* Tr. at 6-9 (Resp't Ex. J). Phyllis told Nybeck that she knew Nybeck and Elaine had lied, asserting that her brother would not do anything like rob the Sugar Creek store. There was some additional conversation about

---

[9]        At the *Stokes* hearing, both the prosecutor and the trial court noted on the record that Kingsley would look at petitioner and his sister, Phyllis, when questioning became heated.

Elaine being in trouble, and, when Phyllis handed the phone back to Kingsley, Kinglsey encouraged Nybeck to change her story. In the background, Phyllis could be heard making threats against Nybeck's young children. *See* The *Stokes* Decision & Order, Record on Appeal at A43-A52 (Resp't Ex. A).

The trial court denied the second C.P.L. § 330.30 motion in an order dated July 5, 2002, finding that Laurey had failed to meet his burden of establishing that there was any new, credible evidence undermining confidence in the guilty verdict. *See* Resp't Ex. A (The *Stokes* Decision) at A43-A52. The court found Kingsley's affidavit and testimony to be "unworthy of belief," *id.* at A49.  While she testified, Kingsley "made constant and obvious eye contact with [petitioner] and Phyllis Laurey," *id.* at A49-50, and came and left with Phyllis each day of the hearing, *id.* at A46.  Furthermore, the tape-recording of the phone call between Laurey and Nybeck was characterized by the court as "absolutely compelling evidence" of the attempts at witness intimidation by petitioner's family. *See id.* at A47-A49. Petitioner did not appeal the denial of the motion to the Appellate Division.

### 2.    Withdrawal of Trial Counsel and the Sentencing Hearing

During court proceedings held on July 12, 2002, trial counsel asked to be relieved from representing Laurey, but stated that for "ethical reasons" he could not explain why. *See* 7/12/02 Tr. at 1 (Resp't Ex. K.) Laurey indicated that he was upset with his trial attorney because he believed that counsel should have secured Maybel Golden's testimony at trial. The trial court agreed to release counsel from representing Laurey, and appointed new counsel to represent Laurey at sentencing.

On August 16, 2002, Laurey was sentenced as a predicate violent felony offender to a

determinate sentence of fifteen years, with five years of post-release supervision. *See* Sentencing Tr. at 4, 11, Resp't Ex. E.

### 3.    The C.P.L. § 440.10 Motions

On April 7, 2003, Laurey filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10(1)(g). *See* Petitioner's C.P.L. § 440.10 Motion dated 4/07/03 at 11, 27-28, 31-37, 38-40, Resp't Ex. M. The trial court denied the motion without a hearing on July 10, 2003. In particular, the court found the assertion that Elaine Laurey had committed perjury was meritless, *see* A56-A57. The numerous third-party affidavits Laurey had submitted in support of the claim were merely cumulative impeachment evidence of "dubious origin and reliability," *id.* at A57-59. The court relied on its previous finding, made after the *Stokes* hearing, that petitioner's family–and in particular Phyllis Dean Long–had pressured witnesses to recant their testimony and as well as solicited third-party witnesses to make statements on petitioner's behalf. *See id.* at A59-A60.

Laurey, acting *pro se*, filed another C.P.L. § 440.10(1)(g) motion, claiming that the police had conducted an inadequate investigation of Nybeck's statement regarding his alleged admission to "Brian." Reiterating his contention that his sister Elaine had committed perjury, Laurey submitted a typed affidavit signed by Elaine in which she purportedly recanted her previous statements implicating petitioner, claiming that she had lied both before the grand jury and at trial. *See* Petitioner's 2004 C.P.L. § 440.10 Motion with Annexed Affidavit of Elaine Laurey (Resp't Ex. Q). In the affidavit, Elaine named Nybeck as her "co-conspirator" in this scheme to falsely implicate Laurey. *See id.* Petitioner also complained that the police failed to investigate evidence that would have indicated that Elaine Laurey was unreliable and had a

penchant for informing on people in order to curry favor with the police to assist her with regard to her own entanglements with the law. *See id.*

In response, the prosecutor submitted Sgt. Schrom's affidavit stating that Elaine had spoken to him and had repudiated this alleged recantation contained in her affidavit submitted by petitioner. According to Sgt. Schrom, Elaine told him that Phyllis, petitioner's sister, had drawn up the affidavit and presented it to her. Elaine claimed that she did not read the statement prior to signing it, and only had signed it in order to get bailed out of jail by Phyllis. According to Sgt. Schrom, Elaine said that she would not have signed it had she known what it contained. Laurey claimed that this was insufficient evidence to show that Elaine had repudiated her recantation, and that, in any event, she was manipulating the authorities.

As Judge Hayden observed in his Decision and Order denying C.P.L. § 440.10 Motion ("2004 C.P.L. § 440.10 Order", Resp't Ex. T), Laurey previously had asserted in his 2003 C.P.L. § 440.10 motion that "his sister, Elaine Laurey, testified falsely against him at trial, and that her testimony was known by the People to be false." 2004 C.P.L. § 440.10 Order at 1 (Resp't Ex. T). Again, as with the first motion, "defendant failed to establish either the falsity of his sister's testimony or that the People had prior knowledge of same." *Id.* The court credited Sgt. Schrom's affidavit indicating that Elaine subsequently had repudiated her recantation and, as such, the recanting affidavit by Elaine was a "nullity" that "fail[ed] to conform to the statutory definition of newly discovered evidence." *Id.* at 2 (citing N.Y. CRIM. PROC. LAW § 440.10(1)(g)). Because the issue was previously determined on the merits in its dismissal of the 2003 C.P.L. § 440.10 motion, the trial judge found that it was "without authority to sustain defendant's motion dated 11/30/04." *Id.* (citing N.Y. CRIM. PROC. LAW § 440.10(3)(b)). Furthermore, the trial court found,

> it is manifest that the Court *must* deny a motion to vacate judgment when, as in the case at bar, "[t]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal." CPL § 440.10(2)(b). Indeed, upon review of the record, this Court finds that the record suffices to permit adequate review of the allegations constituting defendant's CPL [§] 440.10 motion.

*Id.* at 2 (emphasis supplied) (alteration in original).[10] Leave to appeal to the Appellate Division was denied on September 23, 2003.

### 4.    Petitioner's Direct Appeal

Petitioner's notice of appeal was filed on August 22, 2002, but the appeal was not perfected until May 20, 2005. Appellate counsel presented the following four issues on appeal: (1) the prosecutor violated his *Brady* obligation by failing to provide Investigator William Wood's reports regarding tips provided to the police by Elaine Laurey about other criminal activity; (2) the trial court improperly permitted the prosecutor to impeach Penny Laurey at trial with her grand jury testimony; (3) defense witnesses should have been permitted to testify to prior inconsistent statements by prosecution witnesses; and (4) the verdict was against the weight of the evidence, and the evidence was legally insufficient. *See generally* Petitioner's Appellate Brief (Resp't Ex. V).

The Appellate Division, Third Department, unanimously affirmed the judgment of conviction as well as the trial court's denial of C.P.L. § 440.10 relief. *See People v. Laurey*, 24 A.D.3d 1107 (App. Div. 3d Dept. 2005) (Resp't Ex. X). The Third Department further held that Penny Laurey had been properly impeached with her grand jury testimony. With regard to the evidentiary issue, the court held that "[d]efendant failed to lay a proper foundation for that

---

[10]    Laurey's direct appeal had recently been perfected and but it had not yet been decided.

testimony by first confronting the prosecution witnesses about the purported inconsistencies between their trial testimony and the prior statements, and then giving them an opportunity to explain any such inconsistencies[.]" As such, the statements were hearsay and inadmissable. Finally, "[g]iving considerable deference to the jury's opportunity to observe the witnesses and their demeanor, including its ability to selectively credit portions of testimony that it deems worthy of belief while rejecting the remainder," the Third Department could not "say that the verdict was against the weight of the evidence[.]"

Appellate counsel thereafter sought leave to appeal only with regard to the issue of whether Penny Laurey had been properly impeached with her grand jury testimony, after she recanted that testimony at trial. *See* Petitioner's Leave Letter (Resp't Ex. Y). Petitioner submitted a *pro se* letter in which he raised additional issues that had not been raised before the Appellate Division. *See* Petitioner's Supplemental Leave Letter (Resp't Ex. Z). The New York Court of Appeals denied leave to appeal on February 28, 2006. *See People v. Laurey*, 6 N.Y.3d 815 (N.Y. 2006) (Resp't Ex. AA).

### 5.    The Federal Habeas Petition

Laurey commenced the instant habeas proceeding on or about February 22, 2007. *See* Petition (Dkt. #1). He contends that he is entitle to issuance of the writ because

> (1) he was not identified from the still photographs derived from the store's surveillance videotape by any witnesses to the robbery (Ground One), and Elaine's statement to police that her brother "might" be the person in the photographs should have been suppressed ("Additional Facts");
> (2) the police failed to "corroborate any of the facts alleged by witness [sic] Nybeck" and had they investigated, they "would have learned that defendant's friend Bryan Parker was in fact incarcerated on the weekend of July 22, 2001";
> (3) Elaine Laurey, on August 21, 2001, "provided the police with a lot of unreliability [sic] information regarding another individual" and this "provides a

'very strong motive' to curry favors with authorities";[11]
(4) "the witniness [sic] Elaine Laurey recants entire testimony, names Alyce
Nybeck as co-conspirator" and Elaine's affidavit is "direct evidence of two
prosecution prime witness [sic] conspiring while inmates . . . to set up a storey
[sic] against the defendant . . . ."

*See* Petition (Dkt. #1).

Respondent has opposed the petitioner, asserting that all of petitioner's claims are

unexhausted and/or procedurally barred. Respondent asserts that, in any event, all of claims are

without merit. Petitioner submitted a reply brief but did not address respondent's argument

regarding exhaustion and the existence of any procedural defaults.

## III.   General Legal Principles

Only issues of federal law may be raised on habeas review. *See* 28 U.S.C. § 2254(a);

*Estelle v. McGuire*, 502 U.S. 62, 68 (1991). A habeas petitioner exhaust his state court remedies,

see id. § 2254(b-c), by "present[ing] his federal constitutional claims to the highest court of the

state," *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir.1991). "The state court must be fairly apprised

that petitioner is raising a federal constitutional claim and of the factual and legal premises

underlying the claim." *Id.* "An application for a writ of habeas corpus may be denied on the

merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State." 28 U.S.C. § 2254(b)(2).

If, instead of reaching the merits, the state court denies a federal claim based on an

"independent and adequate state procedural rule, federal habeas review of [the] claim[ ] is barred

unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

---

[11]      This appears to be the *Brady* claim regarding Investigator Wood's reports from discussions he had
with Elaine Laurey on August 21, 2001, regarding what she knew about an individual named Lawrence Sutton and
his purported criminal activities–which were wholly unrelated to the robbery for which petitioner was convicted.

alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). For claims "adjudicated on the merits," habeas relief may not be granted unless the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of clearly established federal law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *See id.* at 409. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (quoting *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

State court fact findings underlying habeas claims enjoy a strong presumption of

correctness that can only be rebutted by "clear and convincing evidence." See 28 U.S.C. 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

## IV.    Exhaustion and Procedural Default

Respondent argues that most, if not all, of the claims presented in the petition are unexhausted and, at this point, procedurally barred. Laurey has presented his claims in numerous vehicles in the state courts, and his claims are, at times, rather challenging to unravel due to the complexity of the chronology and the many players involved. Further complicating the determination of which of Laurey's claims are exhausted and/or procedurally barred are several unsettled legal issues that must be resolved, such as whether C.P.L. § 440.10(3)(b) is an "adequate and independent state ground" which operates as a procedural bar to  habeas review . In the interest of judicial economy, the Court recommends avoiding a "detour through the . . . thorny procedural obstacles to considering the merits of a prisoner's petition," *Newton v. Coombe*, No. 95 CIV 9437 GEL, 2001 WL 799846, at *7 (S.D.N.Y. July 13, 2001), and proceeding directly to the "disposition of [these] claim[s] that can more easily be rejected on the merits," *id.*; *see also Thomas v. Phillips*, No. 04-CV-0906 (FB), 2006 WL 39239, at *4 (E.D.N.Y. Jan. 5, 2006).

## V.    Analysis of the Petition

### A.    Ground One regarding the lack of sufficient evidence identifying Laurey as the perpetrator should be dismissed as without merit.

In Ground One of the petition, Laurey essentially has re-alleged the claim, asserted on

direct appeal, that the evidence identifying him as the perpetrator was legally insufficient because there was no identification by either of the witnesses to the robbery. As respondent points out, a petitioner challenging the sufficiency of the evidence supporting his conviction "'bears a very heavy burden.'" *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)). The Supreme Court has instructed that reviewing courts must consider the trial evidence in the light most favorable to the prosecution and must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Great deference is owed by the reviewing court to the jury's assessment of witness credibility. *Id.*; *accord Maldonado v. Scully*, 86 F.2d 32, 35 (2d Cir. 1996); *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994) ("Although appellants emphasize the lack of physical evidence connecting them to the murder and contend that the testifying witnesses were not credible, 'a conviction may be based on circumstantial evidence and inferences based upon the evidence and the jury is exclusively responsible for determining a witness' credibility.'"). When a court is faced with a record that supports conflicting evidentiary inferences, it must presume, under *Jackson*'s "rigorous standard," that the trier of fact "'resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994), *cert. denied*, 514 U.S. 1066 (1995) (quoting *Jackson*, 443 U.S. at 326).

The Appellate Division rejected Laurey's claim of insufficient evidence on the merits as follows:

 A videotape and testimony conclusively established that the robbery occurred; the only question was whether defendant was the perpetrator. Defendant's sister

> [Elaine Laurey] testified that defendant confessed his involvement in the crime, and she identified defendant as the masked robber from photographic stills taken from the store's surveillance video. Another witness [Alyce Nybeck] testified that she overheard defendant bragging to his friend [Brian] about his participation in this robbery a few days after it occurred. This evidence was legally sufficient to establish a *prima facie* case. Giving considerable deference to the jury's opportunity to observe the witnesses and their demeanor, including its ability to selectively credit portions of testimony that it deems worthy of belief while rejecting the remainder, we cannot say that the verdict was against the weight of the evidence[.]

24 A.D.3d 1107, 1109, 807 N.Y.S.2d 437, 440 (citing *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 763 (N.Y. 1987)).[12] Petitioner has not met his burden under the stringent federal constitutional standard set forth in *Jackson*. Petitioner merely repeats his attacks the credibility of the prosecution's witnesses–arguments which were presented to the jury by defense counsel, who strenuously examined, for example, petitioner's sister, Elaine, about her level of certainty regarding who was depicted in the photographs, and Nybeck about her criminal history. Notwithstanding defense counsel's forceful attacks on them, the jury found prosecution's witnesses' testimony to be credible.[13]

Recognizing that it is "the responsibility of the trier of fact to resolve conflicts in the

---

[12]    "In determining whether a verdict is supported by the weight of the evidence, "[e]ven if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.' If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict." Id. (citations omitted). *See also Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1199 (2d Cir. 1995) ("Review of a trial court's ruling assessing the weight of the evidence imposes on an appellate court far more of a burden than arises from review of a ruling rejecting a challenge to the sufficiency of the evidence. The latter ruling can be readily affirmed as soon as the reviewing court identifies adequate evidence in the record that permits the disputed issue to go to the jury, despite the existence of significant opposing evidence. Such review does not require an assessment of all the evidence. Reviewing a ruling on a "weight of the evidence" challenge, however, obliges a reviewing court to examine in some detail all of the evidence.").

[13]    I note that the Third Department also analyzed Laurey's case under the more lenient state law "weight of the evidence" standard, and found that the verdict was not against the weight of the evidence.

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

facts," *Jackson*, 443 U.S. at 319, I cannot say that there was no valid line of reasoning or

permissible inferences that could support its verdict finding Laurey guilty beyond a reasonable

doubt of being the masked robber of the convenience store. Accordingly, I recommend

dismissing Laurey's claim that the evidence was legally insufficient to support the verdict.

### B. Ground Two, regarding the alleged failure of the police to investigate Nybeck's statement, should be dismissed as without merit.

Laurey asserts that he is entitled to habeas relief because the police did not adequately

investigate Nybeck's statement that she overheard Laurey admit robbing a store to a person

named "Brian" at the house owned by Golden over the weekend of July 22, 2001. According to

Laurey, had the police properly investigated, they would have discovered evidence indicating

that the alleged conversation could not have occurred on that weekend.

When Laurey raised the factual predicate of this claim in state court in connection with

his second C.P.L. § 330.30 motion, Laurey styled the claim as one of "newly discovered

evidence" and  presented correspondence from the Chemung County Jail indicating that an

individual named Bryan Parker was incarcerated from July 3, 2001, until July 25, 2001.

Petitioner also provided the trial court with a written statement, purportedly signed by Bryan

Parker on March 20, 2002, and March 27, 2002, in which he claimed that he was not in Elmira

from July 27, 2001, through August 3, 2001. Petitioner argued that the "Brian" to whom Nybeck

referred was actually Bryan Parker.  Thus, petitioner claims, Nybeck could not have overheard a

conversation between petitioner and "Brian" at the crack house over the weekend of July 22,

2001, or during the summer in general, because Bryan Parker was unavailable by virtue of being

incarcerated in Elmira.

-19-

This claim assailing the police department for failing to investigate and discover exculpatory evidence is specious in that Laurey was aware of, and in the position to make use of this information regarding Brian/Bryan Parker at the time of trial. First, as the trial judge noted when denying the C.P.L. § 330.30 motion, petitioner received a copy of Nybeck's statement prior to trial in which she stated that she overheard a conversation between him and "Brian" at Maybel Golden's house on Columbia Street while "visiting with [Golden's] boyfriend Butch [Pannell]"[14] The defense, however, failed to call either Golden or Pannell as trial witnesses to verify who was present at the Columbia Street residence on the weekend in question. This is curious given that it appeared from petitioner's personal letter dated April 26, 2002, to the trial court, that he (petitioner) and defense counsel regularly spoke to Golden. *See* A51. In any event, during the *Stokes* hearing, trial counsel admitted that he knew who Golden was at the time of trial. Trial counsel confirmed that he had been afforded additional time to subpoena her or to have a material witness warrant issued, but that, after discussing the matter with petitioner and his family, they made the decision not to call Golden as a defense witness. *See* A51 (Resp't Ex. A).

Furthermore, petitioner's sister Elaine apparently knew who this "Brian" was: She testified on cross-examination at trial that she knew "Brian" to be petitioner's friend. However, defense counsel did not ask Elaine any further questions regarding "Brian," such as whether she knew his last name. *See id.*

Finally, and what the trial court found "most striking," was that Bryan Parker had been incarcerated *with* petitioner at the Chemung County Jail from December 17, 2001, throughout

---

[14]     Petitioner wrote a *pro se* letter to the trial judge on April 26, 2002, in which he provided Butch's last name as "Pannell." *See* A50 (Resp't Ex. A).

the trial, as well as at the time of the *Stokes* hearing on May 9, 2002, and May 14, 2002. *See* A48
(Resp't Ex. A).  Defense counsel admitted that, based upon his interviews with petitioner and
Kingsley, he was aware that petitioner believed that "Brian" and Bryan Parker were the same
person *before* the *Stokes* hearings held on May 9, 2002, and May 14, 2002. Parker, however, was
never called by the defense, either at trial or at any post-trial proceeding.

I agree with the trial court that the alleged written statement provided by Parker to
petitioner demonstrated that the two of them "clearly had contact while incarcerated and . . .
Parker was aware of [petitioner's] trial and post-trial motions." A51 (Resp't Ex. A). As the trial
court found, this, along with petitioner's admission that he and Parker were friends, strongly
implied that the fact of Parker's incarceration was discoverable at trial. The record amply
supports the trial court's conclusion that petitioner's failure to call Parker at the *Stokes* hearing
"create[d] a strong inference that Parker's testimony would not be favorable to [petitioner]." A51
(Resp't Ex. A) (citing *People v. Copeland*, 185 A.D.2d 280 (App. Div. 2d Dept. 1992) (reversing
grant of C.P.L. § 330.30 motion where the potential testimony of the witnesses sought to be
characterized as "new evidence" was "discoverable by the exercise of due diligence, inasmuch as
he and the defendant were familiar with each other from the neighborhood, had likely seen each
other immediately prior to the commission of the crime at a nearby party, and had spoken at the
Brooklyn House of Detention, where they were both being held during the defendant's trial," and
"the testimony of the witnesses offered by the defendant was not of such a character as to create
the probability of a more favorable outcome")).

"[N]ewly discovered evidence only warrants habeas relief where it bears on 'the
constitutionality of the applicant's detention; the existence merely of newly discovered evidence

relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus.' "
*Mapp v. Clement*, 451 F. Supp. 505, 511 (S.D.N.Y. 1978) (quoting *Townsend v. Sain*, 372 U.S.
293, 317 (1963), *overruled on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)), *aff'd
without op.* 591 F.2d 1330 (2d Cir. 1978), *cert. denied*, 440 U.S. 948 (1979); *accord Herrera v.
Collins*, 506 U.S. 390 (1993). The Supreme Court reiterated in *Herrera* that "[c]laims of actual
innocence based on newly discovered evidence have never been held to state a ground for
federal habeas relief absent an independent constitutional violation occurring in the underlying
state criminal proceeding." In *Herrera*, the Supreme Court emphasized that the due process
clause guarantees only that a trial is procedurally fair, and not that the verdict is factually correct.
*Id.* at 401-02. Courts in this Circuit have held that a petitioner seeking habeas relief based on
alleged "newly discovered evidence" "must show that the exculpatory evidence was suppressed
through prosecutorial misconduct depriving him of his right to a fair trial." *United States ex rel.
Scarincio v. Coughlin*, 657 F. Supp. 433, 436 (S.D.N.Y. 1987) (citing *Welcome v. Vincent*, 418
F. Supp. 1088, 1093 (S.D.N.Y. 1976), *rev'd on other grounds*, 549 F.2d 853 (2d Cir.), *cert.
denied*, 432 U.S. 911 (1977)).

Assuming for the sake of argument that a claim of actual innocence based on newly
discovered evidence is even cognizable on federal habeas review, a petitioner must, as an initial
matter, demonstrate some kind of underlying constitutional injury. Laurey has not identified any
federal precedent indicating that an accused is guaranteed a certain type of investigation by
police agencies. *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58-59 (1988) (rejecting proposition that
the "Due Process Clause is violated when the police fail to use a particular investigatory tool,"
and noting that "the defendant [wa]s free to argue to the finder of fact that certain investigative

tools "might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests"). Construing Laurey's *pro se* pleadings with a lenient eye, it appears that the underlying constitutional injury of which Laurey attempts to complain is the prosecution's alleged failure to turn over favorable defense material. Essentially, then, Laurey would have to establish that the information regarding "Brian's" identity and Bryan Parker's incarceration was withheld from the defense as a result of a discovery violation under *Brady v. Maryland*, 373 U.S. 83 (1963). This he is unable to do.

*Brady* and its progeny require the prosecution to disclose to an accused information in its possession that is favorable to the defense and material to the issue of guilt. *See Brady*, 373 U.S. at 87. There are three components to a true *Brady* violation: The "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. at 281-82; *accord United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002). Prejudice results only when the undisclosed is "material"–when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *see id.* at 685 (opinion of White, J.). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" of the case, *id.* at 682 (opinion of Blackmun, J.). The Supreme Court's formulation of *Brady* materiality requires asking whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). "[T]he defendant is required to show more than just that the error was not harmless beyond a

reasonable doubt." *United States v. Payne*, 63 F.3d 1200, 1209-10 (2d Cir. 1995) (citing *Kyles v. Whitley*, 514 U.S. at 435-36 and *United States v. Agurs*, 427 U.S. at 112 (stating that "the constitutional standard of materiality must impose a higher burden on the defendant" than "the customary harmless-error standard")).

First, the overall importance of the evidence concerning Bryan Parker's incarceration on the weekend of July 22, 2001, is dubious. After the defense notified the prosecution that Bryan Parker had been incarcerated over the weekend of July 22, 2001, Sgt. Schrom questioned Nybeck regarding this issue. According to Sgt. Schrom, Nybeck was "adamant that she overheard the conversation" but did state that if "Brian" was in fact Bryan Parker, then she must have been mistaken about the date. Resp't Ex. J at 5. Moreover, as detailed exhaustively in the trial court's decision and order following the *Stokes* hearing, there was no suppression of information regarding "Brian"/Bryan Parker. Sgt. Schrom testified that the only information that Nybeck could give about Brian's identity was that he was a "larger black male" with a "muscular build"; Nybeck did not know his last name. Resp't Ex. J at 11. The defense was well aware of the contents of Nybeck's statement mentioning Brian, having been provided with it before trial. Given that Laurey admittedly had been friends with Bryan Parker prior to trial, and knew Maybel Golden, the owner of the house where the conversation occurred, he was certainly in as good a position as the police to ascertain the identity of the mysterious "Brian".

Evidence "is not 'suppressed' " by the government within the meaning of *Brady* "if the defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage [that] evidence." *United States v. Payne*, 63 F.3d at 1208 (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993)). Where, as here, the facts are already known by

the defendant, there is no improper suppression within the meaning of *Brady*. *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (no *Brady* violation by nondisclosure of witness's testimony as to a fact within personal knowledge of defendant), *cert. denied*, 500 U.S. 925 (1991); *United States v. Esposito*, 834 F.2d 272, 275 (2d Cir. 1987) (no *Brady* violation where defendant had possession of transcripts containing the pertinent material). Accordingly, I recommend finding that Laurey has failed to establish that any constitutional violation occurred. I further recommend dismissing his claim concerning the allegedly inadequate investigation by the police into Alice Nybeck's statement concerning the identity and whereabouts of "Brian" (Ground Two).

> **C.     The *Brady* claim set forth in Ground Three regarding Investigator Wood's investigative reports should be dismissed as without merit.**

Laurey asserts that the prosecution failed to disclose Inv. Wood's investigative reports from his August 21, 2001, interview with Elaine Laurey, in violation of its disclosure obligations pursuant to *Brady v. Maryland*. On direct appeal, the Third Department rejected this claim on the merits, finding that there was no evidence that Elaine "intentionally lied or falsely implicated another person," but only that "the police could not corroborate the information she supplied regarding another individual." Finding that Inv. Wood's reports "were not exculpatory," the Third Department concluded that the prosecution had "no obligation to turn [the reports] over to defendant." *Id.*

During the *Stokes* hearing held on May 9, 2002, the defense called Inv. Wood, who testified that he had been asked to interview Elaine Laurey about a letter she had sent to the District Attorney concerning information she possessed about various criminal activities. During the interview, Elaine told him that an individual named Lenny Sutton had admitted to her that he

was the shooter in an unrelated homicide on Norton Street in the City of Rochester. Defense

counsel, in his attempt to establish that the police knew of Elaine's alleged unreliability, and

hence the impeachment value of the reports, tried to get Inv. Wood to say that Elaine Laurey did

not know anything of the shooting until after reading about it in the newspaper. However, as Inv.

Wood responded, defense counsel plainly misconstrued his investigative report. Indeed, a careful

reading of Inv. Wood's report belies defense counsel's theory and petitioner's contention. The

report indicates that when Elaine ran into Sutton at the Chemung County Jail, she asked what he

was "in for" and he responded that he had "shot at some people from Rochester, and that in

doing so, he also shot up a house in the process." A61 (Resp't Ex. A). At the time of her

conversation with Sutton at the jail, Elaine told Inv. Wood, she did not know anything of the

shooting; it was only a few days later when she read about the shooting on Norton Street did she

connect the two. *See id.* Furthermore, Inv. Wood never testified that he knew that the

information received from Elaine was inaccurate or that she lied; he merely stated that he was

unable to verify "a lot" of what she told him. *See* Resp't Ex. I at 59-61.

On habeas review, this Court must presume that the state court's factual determination

was correct unless rebutted by clear and convincing evidence. See  28 U.S.C. § 2254(e)(1)

(providing that "a determination of a factual issue made by a State court shall be presumed to be

correct"  unless the petitioner "rebut[s] the presumption of correctness by clear and convincing

evidence" ); *Leslie v. Artuz*, 230 F.3d 25 (2d Cir.2000). Moreover, because the determination of

factual issues by state courts are presumed to be correct, see  28 U.S.C. § 2254(e)(1), to prevail

under section 2254(d)(2) a habeas petitioner must disprove the factual finding by clear and

convincing evidence and demonstrate that the state court's factual determination was objectively

unreasonable. *See Miller-El*, 537 U.S. at 341.

The state court's finding that the reports in question were not exculpatory is a finding of fact which is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). Petitioner has failed to provide any evidence, let alone clear and convincing evidence, to suggest that the trial court's factual finding regarding the disclosure of the FBI report was erroneous. *See See Blake v. Chapman*, No. 97 CV 4800, 1998 WL 564378, at *4 (E.D.N.Y. June 17, 1998) ("The petitioner has not rebutted the presumption of correctness of these facts by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The decision of the State court that there was no exculpatory evidence that the prosecution should have revealed to petitioner was based on an reasonable determination of the facts. 28 U.S.C. § 2254(d)(2)."); *Strickler v. Greene*, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory  material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."). Furthermore, the decision of the Third Department, that there was no exculpatory or impeaching evidence that the prosecution should have revealed to petitioner, was not based on an unreasonable determination of the facts in light of the evidence presented at the *Stokes* hearing. *See* 28 U.S.C. § 2254(d)(2). Accordingly, I recommend that Laurey's *Brady* claim (Ground Three) be dismissed.

### D.   The perjury/recantation claim (Ground Four) should be dismissed as without merit.

The fourth claim for relief in Laurey's petition relates to Elaine's affidavit recanting her trial testimony, and Kingsley's affidavit that Elaine and Nybeck conspired to frame Laurey for the robbery. *See* Petition at 8, ¶22(D).  It "is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, . . . [and the] same result obtains when the State, although not soliciting

false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269

(1959) (internal and other citations omitted).  The Supreme Court has consistently reiterated this

formulation of the due process standard, noting only that due process is violated by the "knowing

use of perjured testimony." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see id.* at 103-04 &

nn. 8-9 (discussing cases). Under this standard, a conviction must be set aside if "the prosecution

*knew, or should have known*,[15] of the perjury," and "there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury." *Id.* (emphasis added). Laurey has

never come forward with any evidence suggesting that the prosecutor knowingly played a part in

allegedly suborning perjury by any witnesses for the state.

Moreover, the Supreme Court "has never held that even absent prosecutorial knowledge

of perjury at the time of trial, a defendant may establish a due process violation based on perjury

on the part of a prosecution witness." *Penick v. Filion*, 144 F. Supp.2d 145, 152 (E.D.N.Y.

2001); *see Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of

*certiorari*) (noting that the Supreme Court had yet to consider the question of whether due

process is violated by a conviction based on perjured testimony regardless of the prosecutor's

knowledge). There is Second Circuit precedent, *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir.1988),

which permitted the granting of habeas relief even in the absence of prosecutorial knowledge of

perjury. Importantly for the resolution of Laurey's claim, the Second Circuit in *Drake v.

Portuondo*, rejected petitioner's urging that it rely upon *Sanders*, noting that *Sanders* "explicitly

relied on Justice Douglas' dissent in *Durley v. Mayo*, 351 U.S. 277, 290-91 (1956)," while

"AEDPA permit[ted] [it] to rely only on clearly established Supreme Court precedent." (citing

---

[15]        The  Second Circuit has thus far declined to "draw the contours of the phrase 'should have known.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003).

*Sanders*, 863 F.2d at 223-24). Under AEDPA, Laurey is entitled to habeas relief only if he can show an unreasonable application of "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Thus, regardless of the correctness of the state court's decisions with respect to the newly discovered evidence as a matter of state law, Laurey has failed to establish that its of this issue was contrary to, or an unreasonable application of, any clearly established Federal law as determined by the Supreme Court.

Even if Laurey were entitled to rely upon Circuit precedent such as *Sanders v. Sullivan*, he has failed to make out a meritorious claim that his trial should be overturned based upon Elaine's recantation.[16] The underlying perjury claim was first raised based on Kingsley's affidavit regarding the alleged cabal between Elaine and Nybeck. Kingsley's story was fully explored at the *Stokes* hearing in 2002, after which the trial court found Kingsley's testimony to be "unworthy of belief." Resp't Ex. A at A43-A52. When Laurey later attempted to present Elaine's recanting affidavit as "new evidence" in support of his 2004 C.P.L. § 440.10 motion, the trial court similarly found it to be entirely unreliable in light of Elaine's subsequent statement to Sgt. Schrom repudiating that recantation and reaffirming her trial testimony.

The Second Circuit has "instructed district courts to view even an *unrepudiated* recantation with the "utmost suspicion." *United States v. Lespier*, 2008 WL 116294, at *1 (2d Cir. Jan. 11, 2008) (unpublished op.) (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir.

---

[16]    *See Penick v. Filion*, 144 F. Supp.2d at 153 ("Before relief may be granted on the basis of recanted testimony, three requirements must be met: "First, the petitioner must demonstrate that a trial witness has recanted his testimony. Second, ... the court [must] determine whether the recanted testimony was 'material', that is, whether the recantation, if known to the jury, would 'probably' alter the outcome of the trial. Third, if the court finds that the recantation is 'material', it must then determine whether the petitioner has demonstrated that the recantation is 'reliable'." *Grosso v. Artuz*, No. 97 Civ. 1623(SAS) (MHD), 1998 WL 108011, at *1 (S.D.N.Y. Mar. 12, 1998) (citing *Sanders*, 863 F.2d at 222, 225), *aff'd*, 1998 WL 341935 (S.D.N.Y. June 19, 1998)) (footnote omitted).

2003) (internal quotation marks omitted in original; emphasis in original). *See also United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987) ("Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'") (quoting *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (2d Cir.) (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954) (quoting *Harrison v. United States*, 7 F.2d 259, 262 (2d Cir.1925))), *cert. denied*, 423 U.S. 841 (1975).

On the record before it, and after hearing all of the witness testimony, the trial court was entirely justified in viewing the ""recanted recantation . . . with extreme skepticism." *United States v. Gallego*, 191 F.3d 156, 166 (2d Cir.1999), *cert. denied*, 530 U.S. 1216 (2000), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).The court found that Phyllis Dean had blatantly pressured Elaine and Nybeck to recant their testimony and actively solicited individuals to submit statements benefitting petitioner's case. *See* Resp't Ex. A at A47, Resp't Ex. K at 4-5.  The trial court credited Elaine's explanation that she had signed the recanting affidavit without reading it and only had done it because she wanted Phyllis Dean to bail her out of jail. Kingsley, on the other hand, was found to be inherently incredible by the trial court, who also found that she appeared to be under petitioner's thrall.

The presumption of correctness accorded to a factual determination is "particularly important when reviewing the trial court's assessment of witness credibility." *Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir. 2003).  Laurey has failed to come forward with any evidence, let alone clear and convincing evidence, to rebut the presumption of correctness accorded to the state court's factual finding, *see* 28 U.S.C. § 2254(e)(1), concerning the credibility of his sister

-30-

Elaine's recantation and the truthfulness of Elaine's and Nybeck's trial testimony. *See Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (in determining whether conviction was obtained through knowing use of false evidence, "court must weigh all the evidence of perjury before it, including but not limited to the recantation"). Accordingly, Laurey has not come forward with clear and convincing evidence demonstrating that the state court made an unreasonable factual determinations first, that Elaine's recantation was untruthful, and second, that her trial testimony was not perjured.

> **E.    The claim stated in "Additional Facts", which Respondent has referred to as Ground Five, regarding the suppression of the "identification" by Elaine Laurey should be dismissed as without merit.**

Laurey contends that the trial court should have suppressed his sister Elaine's "identification testimony"–that is, her statement to police that it "could" be her brother depicted in the still photographs taken from the store surveillance videotape. *See* Petition, "Additional Facts" (Dkt. #1). The legal basis for this assertion is unclear, although, as respondent notes, it does not appear to have been raised in any of Laurey's post-conviction applications for relief. Whether it is viewed as a part of Laurey's insufficiency-of-the-evidence claim, or as a contention that he was entitled to a *Wade* hearing, it should not be found to provide a basis for habeas relief.

As respondent points out, Elaine was not a witness to the robbery. Neither her statement to the police nor her testimony about viewing the photographs addressed whether Laurey committed the crime. Rather, the sum and substance of her testimony regarding the photographs was that the individual shown in them looked like her brother. To the extent that Elaine was equivocal on this point, her credibility was fully tested on cross-examination. And, the jurors themselves were able to view the photographs and determine whether Laurey actually resembled

the man depicted therein. Laurey has presented no basis whatever for second-guessing the jury's perceptions and findings on these issues.

Moreover, this is not a situation where Laurey was entitled to a hearing pursuant to *Wade* to determine "whether pre-trial identification procedures have been so improperly suggestive as to taint an in-court identification." *Twitty v. Smith*, 614 F.2d 325, 333 (2d Cir. 1979) (citing *United States v. Wade*, 388 U.S. 218, 242 (1967)). The concern addressed by the Supreme Court in *Wade* was the unreliability of eyewitness testimony. *See Wade*, 388 U.S. at 228-29. Here, however, there was no eyewitness to the crime in progress who was able to identify Laurey–either before trial or during the trial.

Even construing Laurey's allegations in an extremely generous fashion, *see* Resp't Mem. at 38, so as to assert that Elaine made a "confirmatory identification," Laurey cannot show a federal constitutional violation. As respondent points out, under New York law, a witness' "confirmatory identification" of a defendant from a single photograph does not implicate due process concerns. *See Wiggins v. Greiner*, No. 03-2212, 132 Fed. Appx. 861, 865, 2005 WL 1182091, at **3 n.3 (2d Cir. May 18, 2005) ("Under New York law, a 'confirmatory identification' from a single photograph does not implicate due process concerns. *See People v. Rodriguez*, 79 N.Y.2d 445, [453], 583 N.Y.S.2d 814, 593 N.E.2d 268 (1992). Whether the challenged photo display in this case clearly qualifies as a confirmatory identification is an issue of state law not relevant to our habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). We consider only whether the state courts unreasonably applied clearly established *federal* law.") (emphasis in original) (unpublished opn.). Because Laurey's allegations under "Additional Facts" fail to set forth a colorable basis for habeas relief, I recommend that they be

dismissed.

## VI.    Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner be denied. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  June 26, 2008
Rochester, New York.

-33-

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  June 26, 2008
　　　　Rochester, New York.